MOUNTAIN COPPER CO., Limited, v. PIERCE.

(Circuit Court of Appeals, Ninth Circuit. February 20, 1905.)

No. 1,107.

MASTER AND SERVANT—INJURIES TO SERVANT—INEXPERIENCE—WARNING.

Where defendant directed an inexperienced servant to adjust a belt on a pulley shaft, without instructing him with reference to a collar and set screws projecting from the shaft, by which he was caught and seriously injured while endeavoring to adjust the belt, defendant was guilty of negligence entitling plaintiff to recover for injuries so sustained.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 314, 315.]

In Error to the Circuit Court of the United States for the Northern District of California.

Van Ness & Redman and T. C. Van Ness, for plaintiff in error.

Frank Freeman, William M. Cannon, and George K. Ford, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The defendant in error was seriously and permanently injured while employed upon that portion of the plant of the plaintiff in error known as the "McDougall Furnaces," and, in an action for damages therefor, was awarded by a jury $15,000, for which, with costs, he was given judgment against the plaintiff in error.

The McDougall furnaces were used for roasting ores, and were round in form, 30 feet high, and 20 feet in diameter. They were located under a shed roof built over posts extended from the ground, the roof being 60 feet above the ground. There were six furnaces in that battery, three on each side of a revolving shaft, and located 3 or 4 feet from each other. The shaft was 3 inches in diameter, 70 feet long, revolved 10 feet above the ground, and turned belts that operated the furnaces by means of pulleys affixed to it. On each side of the shaft, running parallel with it, was a timber 8x12 inches, and distant 2 feet from and 2 feet below the shaft. These timbers are designated on the drawing "A" and "B," respectively. Two timbers, each 12x12 inches, called "J" and "K" on the diagram, extended perpendicularly from the ground above the shaft, and between the timbers A and B, leaving a space between them of 2 feet. Extending from timbers J and K was a crosspiece 12x12 inches, resting upon which was a cast-iron bearing box, through which the shaft passed, and upon the shaft, immediately to the north of the bearing box, was a collar. This collar (including that of the shaft) had a diameter of 7½ inches, and was attached to the shaft by set screws that projected

above the collar five-eighths of an inch, and, of course, revolved with the shaft. The collar and set screws had been at the outer end of the shaft, but, according to the testimony of the assistant master mechanic of the plaintiff in error, had been removed to their location between the posts J and K in order that they might be out of the line of danger. To the south of the timbers between which the collar and bearing box were placed, and nearly a foot to the south line of the timbers, was a pulley, attached to the shaft, marked on the diagram "F," which turned a belt marked "I," communicating with a furnace on the east side of the shaft. About 6 inches south of the first pulley was another pulley affixed to the shaft marked "G" on the drawing, which turned a belt marked "H," connected with machinery that operated a furnace on the west side of the shaft. From the timber K to the end of the timber B was about 6 feet. Both pulleys mentioned were 6¼-inch face, and 8 inches in diameter. The rims of the pulleys came out beyond the hub, which was about 4 inches through. The rate of speed for which the mechanism was constructed was 250 revolutions a minute, but at the time of the accident in question it was running about 200 revolutions a minute. There was a notch of 4 inches cut into the timber B, through which the belt, I, ran, and when in operation the top of the belt was about 4 inches above the top of the timber B. There was a 4x10 inch timber bolted on the north side of timbers J and K about 3 or 4 feet below the level of the shaft. A man going upon the timber A or B to adjust the belts or machinery, or to oil the journal or bearing box, would go up a ladder to timber A or B. He could then walk along either of those timbers, stepping over the belts where necessary; and, in going from one of them to the other, he would necessarily have to step over the shaft. Everybody of ordinary sense knows, and therefore the court must know, without any testimony to that effect, that the doing of either of those things when the machinery is in rapid motion is necessarily attended with more or less danger. Up to within a few minutes of the accident in question there was nothing wrong with these belts or pulleys, and the machinery was running smoothly. But then one of the belts came off, and it became necessary to adjust it. In attempting to do so, the defendant in error received the injuries complained of.

Testimony was given at the trial tending to show that he was not familiar with machinery, and, indeed, knew little or nothing about it. He had been in the employ of the defendant company for about four or five months, working at its Ropp furnaces, in loading cars, pushing them to the proper place, and dumping the ore into the furnaces. Work having been suspended at that place for certain repairs, the defendant in error was sent by the foreman of the mine to work at the McDougall furnaces, where one Neil Ryan was already employed. The testimony of the defendant in error was to the effect that the foreman told him to report to Ryan, and to do whatever Ryan told him, whereas the testimony of the foreman was to the effect that his instructions to the defendant in error were that he should not undertake to do anything with the belting, gearing, or other machinery, but simply to look after the furnaces. The defendant in error had

been at work at the McDougall furnaces for about two weeks when the accident happened. The foreman, Davis, was in and out from time to time; and on one occasion while he was there one of the belts came off of its pulley, when Davis told the defendant in error to go up and put it on the pulley. The latter undertook to do so, but, being awkward in going up, Ryan went up instead; the defendant in error remaining below to assist Davis in putting the belt on the lower pulley. On that occasion, which was about a week before the accident in question, Ryan put the belt on the upper pulley while the machinery was in operation. On the 21st of April, 1901, one of the belts became unlaced, and Ryan called on the defendant in error to help him lace it. Davis, the foreman, was there while it was being laced, but left before the lacing was completed. When finished, Ryan told the defendant in error to climb up and put the belt on the upper pulley, and that he would remain below and put it on the lower one. The defendant in error, according to his testimony at the trial, then asked Ryan if he wanted the machinery stopped, to which Ryan responded: "No; Mr. Bennett [the superintendent's assistant] would give me h——— if he came down and found the machinery closed up." Not only was such statement by Ryan denied by the plaintiff in error, but testimony was given in its behalf that the only safe and proper way to put the belt on the pulley was first to stop the machinery. At all events, that was not done in the instance in question, and the defendant in error undertook to adjust the belt while the machinery was in operation. He testified that he knew nothing about the collar or set screws, and that neither the foreman nor Ryan nor any one else told him of their existence, nor of the danger attending the operation, or how to perform it. While it is contended on the part of the plaintiff in error that both the collar and set screws could have been seen by the defendant in error if he had properly looked, it is not contended that he was told of their existence, or of the danger attending the operation, or how to perform it. True it is that the defendant in error knew that it is dangerous to approach shafting, belting, or other machinery in motion. That fact not only appeared from his own testimony, but is a matter of such common knowledge that every one in his senses must be held to know it. Nevertheless it is the duty of the master, before sending or permitting an inexperienced employé to perform such dangerous work, to instruct him how to perform it, and especially to inform him of any hidden, concealed, or obscure danger. In the present case there were three ways in which the belt could have been put on its pulley, all attended with more or less danger if done while the machinery was in motion— one by standing on timber A, another by standing on timber B, and still another by standing on the cross-timber extending from A to B, and reaching between the upright timbers J and K over the bearing box. It is insisted on the part of the plaintiff in error that the latter was an out of the way place, and that the company could not have anticipated that any one would go there to adjust a belt. Yet it was the very place selected by this inexperienced man for the purpose, resulting in the catching of his clothing by the set screws, of which he had no knowledge, and of the existence of which he had

not been informed, and the mangling of his body in a frightful manner.

The law, in our opinion, made it the duty of the plaintiff in error to inform the defendant in error of the collar and set screws, and how to perform the dangerous task, before sending or permitting him, in the course of his employment, to undertake it. The action of the court below, both in ruling upon the motion that the jury be instructed to return a verdict for the defendant, and in its instructions, was in substantial accord with these views. And being also of the opinion that we would not be justified in holding the verdict excessive in amount, in view of the extent of the defendant's injuries and of the evidence in the case, we must affirm the judgment.

Judgment affirmed.